# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

JOHN BARNHARDT,

    Plaintiff,

       v.

DISTRICT OF COLUMBIA, *et al.*,

    Defendants.

Civil Action No. 07-0624 (JDB)

## MEMORANDUM OPINION

In this civil rights action, plaintiff John Barnhardt seeks damages for injuries resulting from his alleged false arrest in 2004. He asserts claims under 42 U.S.C. §§ 1981 and 1983 and directly under the Fourth and Fifth Amendments against the District of Columbia and two Metropolitan Police Department ("MPD") officers. This matter is now before the Court on defendants' motion for summary judgment. Having considered the motion, plaintiff's opposition, and the entire record of this case, the Court will grant the motion in part and deny it in part.

## I. BACKGROUND

### A. *Barnhardt's Arrest*

On the evening of February 13, 2004, Sergeant Curt Sloan and Detective Allee Ramadhan of the MPD drove to the home of John Barnhardt for the purpose of serving him with a grand jury subpoena. *See* Pl.'s Mem. in Opp'n to Defs.' Mot. for Summ. J. ("Pl.'s Opp'n"), Ex. B ("Sloan Dep.") at 11:11-20, 20:18-21:8 & Ex. C ("Ramadhan Dep.") at 5:1-19. At that

time, they were members of a task force comprised of MPD and Drug Enforcement

Administration personnel, the goal of which was to develop cases against narcotics dealers

operating in the District of Columbia, Maryland and Virginia. Sloan Dep. at 4:18-5:9;

Ramadhan Dep. at 3:20-4:1. The subpoena related to a criminal case against Barnhardt's brother

for narcotics offenses and assault on a police officer. *See* Sloan Dep. at 15:21-16:6, 20:18-21:8.

Sloan previously had attempted to serve Barnhardt with the subpoena on December 15, 2003, but

was unsuccessful. *See* Pl.'s Opp'n at 4-7; *see also id.*, Ex. A ("Barnhardt Dep.") at 10:5-11:1.[1]

When Sloan and Ramadhan arrived at Barnhardt's residence, there were two vehicles

parked in the driveway: a white pickup truck and a black SUV belonging to Barnhardt's sister

who had driven her SUV into the driveway just before Sloan and Ramadhan arrived. Barnhardt

_____

[1]     Regarding the December 15, 2003 attempt to serve the subpoena, Sloan stated:

> [W]hen I approached the car – when I approached the driveway, rather, Mr.
> Barnhardt got into what I believe was a blue Buick Century, quickly got into it, into
> the driver's seat. He was the only occupant. Put his car in reverse and sped out of
> the driveway in reverse . . . at a high rate of speed, driving against the one-way sign.

Sloan Dep. at 6:17-7:7. Barnhardt described the encounter as follows:

> I had drove up my driveway, and I had my – had my nephew with me. And
> when I had drove up, Sergeant Sloan came from my left side; two other officers,
> unknown to me – I didn't know they was officers at the time – but three gentlemen,
> Caucasian, which was Sloan came from my left and the other two was on the right
> side.
>      Sergeant Sloan, in an aggressive manner, came and tried to open my door in
> an aggressive manner. I locked my door. And when that happened, I started to pull
> off, back out of my driveway.
>      Then Sergeant Sloan had jumped on the hood of my car and onto the – to the
> mirror, hanging off, and I pulled away and he flew off, and then I just pulled off and
> went down the street.

Barnhardt Dep. at 10:6-11:1.

Dep. at 35:10-11, 37:11-38:1; Sloan Dep. at 22:10-14, 22:18-23:3; Ramadhan Dep. at 10:10-12. She remained in the driver's seat of the SUV as the officers and Barnhardt approached one another. Sloan Dep. at 22:12-23:3; Ramadhan Dep. at 10:10-12. Also present was Barnhardt's neighbor who had walked to Barnhardt's house. Barnhardt Dep. at 28:-20-30:21. Barnhardt was walking along the driveway towards the street when the officers arrived. *Id.* at 37:10-17; Ramadhan Dep. at 11:5-17.

Sloan parked his vehicle at an angle behind the SUV and blocked the driveway. Sloan Dep. at 22:4-9; Barnhardt Dep. at 37:9-38:15. The two officers got out of their vehicle and approached Barnhardt. Sloan Dep. at 22:12, 24:3-4; Ramadhan Dep. at 10:13. Sloan wore a black nylon jacket with the word "POLICE" written across the front and his shirt sleeves bore an MPD patch and sergeant chevrons. Sloan Dep. at 21:17-21. Ramadhan wore a bulletproof vest with the word "POLICE" written on it in large yellow letters. Ramadhan Dep. at 10:13-16. Barnhardt recognized Sloan as the same police officer he had seen at a hearing in his brother's criminal case and who came to his house on December 15, 2003. Barnhardt Dep. at 40:10-42:2. At this point, the participants' stories diverge.

### 1. Barnhardt's Account

When asked to identify himself, Barnhardt first gave the officers the fictitious name of "Tony Hicks." Barnhardt Dep. at 42:5-43:6. Before allowing Barnhardt to retrieve his wallet from the back pocket of his pants, Sloan patted the pocket. *Id.* at 43:9-14. Barhardt then produced his father's identification, *id.* at 43:9-18, before correctly identifying himself and producing his own identification, *id.* at 45:2-4, 47:17. Ramadhan hit Sloan on the arm, *id.* at 45:19-21, directed Sloan to wait with Barnhardt, and walked up the driveway while, as Sloan

directed, Barnhardt spread his hands on the hood of the SUV, *id*. at 47:17-48:5.

Barnhardt observed Ramadhan, who was standing behind the pickup truck, pull out of his sweater an object later described as a black shaving bag. Barnhardt Dep. at 49:15-17, 50:3-5. Ramadhan then signaled Sloan, who immediately restrained Barnhardt on the SUV. *Id*. at 51:13-20. Barnhardt fought Sloan and tried to break Sloan's hand. *Id*. at 52:8-11. Ramadhan then approached, *id.* at 52:16-17, and when Sloan and Ramadhan grabbed Barnhardt's hands, Barnhardt fell onto the bag, which had been opened and now lay in the yard, *id.* at 52:18-20, 54:6-7. Sloan and Ramadhan forced Barnhardt's hand into the bag. *Id*. at 54:15-55:21. Barnhardt had never seen the bag before, *id.* at 55:4-5, and he believed that "one of the officers put it there," *id.* at 55:7-8. During the struggle, Sloan called Barnhardt a "motherfucker" and a "black nigger." *Id.* at 82:18-18.

Several officers arrived soon afterwards, and Barnhardt was handcuffed and his legs were shackled. *See* Barnhardt Dep. at 66:17-68:9. Sloan searched him, *id*. at 70:8-11, and the search entailed the removal of items from his pockets and the removal of his belt, *id*. at 72:9-14. Barnhardt's pants fell down when the belt was removed, and an officer helped to pull his pants up. *Id*. at 77:19-21. Barnhardt remembered having approximately $3,900 cash with him when he was searched, which he explained was for materials and labor for a job he was doing for a neighbor. *Id*. at 72:15-73:9. The officer who helped Barnhardt pull up his pants took Barnhardt to the DEA headquarters. *Id*. at 78:20-79:1, 85:3-8. Sloan later came to the DEA office and searched Barnhardt again. *Id*. at 85:20-21.

### 2. Ramadhan's Account

Ramadhan joined the MPD in 1990, Ramadhan Dep. at 36:14-16, and in his years as an

officer he had "been involved in numerous drug and gun offenses," *id.* at 40:3-4, meaning, presumably, that he had made many arrests for gun and drug offenses.

Ramadhan observed Barnhardt toss a black object into the pickup truck as he was approaching the officers. Ramadhan Dep. at 10:16-19. He described the object as "a small shaving kit bag, like . . . a small box shape." *Id.* at 10:20-11:2. Ramadhan became suspicious of Barnhardt when, after seeing police officers approach him, he disposed of an object in his possession – such conduct, Ramadhan believed, was "consistent [with] someone disposing of contraband." *Id.* at 33:11-12.

Ramadhan walked back to the pickup truck, *id.* at 14:14-19, and saw two black items in the bed of the truck: a black shaving bag, and a large battery, which Ramadhan knew could not have been tossed, *id.* at 15:11-17. Ramadhan opened the bag and "observed a white rock-like substance, which is consistent with cocaine."[2] *Id.* at 15:18-20. Ramadhan stated that the amount of drugs, the scales and the razor blades were "consistent with possession with intent to distribute." *Id.* at 56:1-2. Ramadhan then walked back towards Sloan and Barnhardt, and gave Sloan the signal to arrest. *Id.* at 15:20-16:15. The drugs were left on the hood of the SUV while Sloan and Ramadhan struggled with Barnhardt. *Id.* at 18:3-5. The officers also called for assistance because other individuals were approaching to within 10 feet and they were yelling at Sloan and Ramadhan. *Id.* at 21:5-20. During the struggle, the parties were never close to the bag, and Ramadhan watched the bag the whole time "to make sure that nobody would grab it." *Id.* at 29:12-20.

---

[2]     The bag also contained razors and a scale with Barnhardt's fingerprint on it. Pl.'s Opp'n, Ex. D (Tr. of Ruling before Dist. Judge Friedman, *United States v. Barnhardt*, No. CR-04-0132 (D.D.C. May 14, 2004)) at 12:24-13:1.

After Barnhardt was arrested, he was searched, and over $3,000 was found in his pocket. *Id*. at 23:4-10. Ramadhan observed Sloan search Barnhardt; Sloan did not strip search Barnhardt. *Id.* at 44:7-14. Ramadhan telephoned his wife, Tina Ramadhan, an MPD crime scene search officer, *id*. at 25:12, after Barnhardt had been transported to find out whether she was available to assist with evidence recovered at the scene. *Id.* at 24:5-9. He has made such calls whenever he recovered drugs "[o]nly because it's faster . . . than . . . going through the dispatcher." *Id.* at 24:13-19. "[O]ther officers call [Tina Ramadhan] directly because they know it's faster to go through her." *Id.* at 25:18-19.

3. <u>Sloan's Account</u>

Sloan joined the MPD in 1988, Sloan Dep. at 38:8-10, attained the rank of Sergeant in 1993, *id.* at 39:9-12, and among other assignments he had served with vice units and in the major narcotics branch, *id*. at 39:1-6, 40:4-8, 40:18. Sloan "had . . . knowledge that [Barnhardt] had been involved in some narcotics activities" in the past, *id*. at 16:21-17:6, but had no specific information that Barnhardt was dealing drugs, *id*. at 20:4-5.

When Sloan asked Barnhardt his name, Barnhardt claimed to be Tony Lawrence. Sloan Dep. at 24:5-11. Sloan asked Barnhardt for identification. *Id.* at 24:11. At this time, Sloan asked Barnhardt to put down the tools he was holding in his left hand; Barnhardt complied, and Sloan moved the tools away from Barnhardt. *Id.* at 24:12-16. Before allowing Barnhardt to reach for his wallet, Sloan squeezed the pocket "to make sure it was just that, the wallet." *Id.* at 25:17-18. Barnhardt then produced his identification. *Id*. at 26:7-10.

By this time, Ramadhan was approaching the pickup truck. *Id.* at 28:2-3. Sloan believed that Ramadhan "had observed something . . . and he wanted to . . . investigate." *Id.* at 28:11-24.

At Ramadhan's direction to "hold onto Mr. Barnhardt," *id.* at 28:15, Sloan instructed Barnhardt

to place his hands on the hood of the SUV, *id.* at 28:5-6. Barnhardt's hands repeatedly slid

down, and Sloan repeated his direction to Barnhardt to put his hands back on the vehicle. *Id.* at

14-19. Based on his experience, Barnhardt's noncompliance "put[] the alert level up a little bit."

*Id.* at 29:21-30:1. Sloan saw Ramadhan moving at the back of the pickup truck, but focused his

attention on Barnhardt until Ramadhan gave a verbal signal to arrest Barnhardt. *Id.* at 30:6-12.

Sloan told Barnhardt to place his hands behind his back, and radioed for assistance after

Barnhardt started struggling. *Id.* at 30:19-31:20, 32:16-17. Sloan did not observe Barnhardt toss

an object, *id.* at 28:19-21, and Ramadhan did not say anything to Sloan at the time Ramadhan

allegedly observed Barnhardt toss the object into the pickup truck, *id.* at 29:8-10.

Once Barnhardt had been subdued, Sloan searched Barnhardt's pockets, shoes, and

socks, and removed his belt and shoelaces, which Sloan stated is standard procedure before

transport. *Id.* at 33:5-17. Sloan denied that Barnhardt was strip searched, *id.* at 33:8-10, and

Sloan did not remember Barnhardt's pants being lowered during the search, *id.* at 33:18-19.

Barnhardt was transported to the 7th District by another officer because the vehicle Sloan was

driving was not suitable for transporting an arrestee. *Id.* at 36:11-21, 37:1-6.

The crime scene officer who came to process the evidence was Tina Ramadhan,

Detective Allee Ramadhan's wife. *Id.* at 34:1-9. Sloan remembered calling Tina Ramadhan "on

a . . . couple of occasions even when [Sloan] wasn't with [Ramadhan] to get assistance with a

particular scene." *Id.* at 34:18-20.

### B. Criminal Proceedings

According to the criminal complaint, on February 13, 2004, Barnhardt "did unlawfully,

knowingly and intentionally possess with intent to distribute a mixture and substance containing a detectable amount of cocaine," and thus he was charged with one count of unlawful possession with intent to distribute cocaine in violation of 21 U.S.C. § 841(a)(1) & (b)(1)(C).  Criminal Complaint, *United States v. Barnhardt*, No. 04cr132 (D.D.C. Feb. 17, 2004); *see* Mem. of P. & A. in Supp. of Defs.' Mot. for Summ. J. ("Defs.' Mem."), Ex. A (Arrest/Prosecution Report).  After an initial appearance, at which time he was ordered held without bond, and a postponement at Barnhardt's request, on March 3, 2004, Magistrate Judge Facciola held the preliminary hearing and detention hearing.  *See* Transcript of Preliminary Hearing and Detention Hearing ("Tr."), *United States v. Barnhardt*, No. 04cr132 (D.D.C. Mar. 17, 2004).[3]

The government presented testimony only from Ramadhan, who Barnhardt's counsel cross-examined.  *See* Tr. 3:19-38:14.  Barnhardt had an opportunity to present evidence and his counsel declined to do so.  Tr. 39:19-22.  Magistrate Judge Facciola ultimately found "probable cause to believe that [Barnhardt] committed the crime with which he [was] charged, Tr. 39:23-24, and had the following exchange with Barnhardt's counsel:

| | |
|---|---|
| Counsel: | Your Honor, I know this Court moved to the probable cause determination awfully quick.  I would like to speak on a couple of things, though. |
| MJ: | Go ahead. |
| Counsel: | In terms of the probable cause determination, there is no indication here that the officer saw Mr. Barnhardt for more than maybe one or two seconds with this object [referring to the black shaving bag].  There is no indication here that Mr. Barnhardt, assuming that that was seen in the manner in which it was seen, had knowledge of what was in that container, which was closed . . . and there was no obvious sign[] that Mr. Barnhardt at that time was manipulating that so as to indicate – |

---

[3]    The hearing took place on March 3, 2004, and a transcript of the hearing was entered on the docket on March 17, 2004.

| MJ: | [Counsel], there were two objects in the back of the truck. One was the shaving case, the other was a battery. |
| Counsel: | I appreciate that. |
| MJ: | It's not very likely that when Officer Ramadhan showed us what he did [referring to Ramadhan's courtroom demonstration of the tossing motion he observed Barnhardt make], that anybody could fling a battery like that. |
| Counsel: | I appreciate that, but the fact that if he did fling that in the manner in which he did, did he have knowledge of what's inside, when you're talking about a black leather shaving . . . kit which you can't see through – |
| MJ: | Couldn't a reasonable person determine that upon seeing Detective Ramadhan and seeing the word "Police," took the object in the hopes of disassociating himself with it, that consciousness of guilt would be . . . evidence of his knowledge of its contents? |
| Counsel: | No, because given the way . . . officers routinely in the District of Columbia seize objects from people, and the difficulty in getting objects back under any circumstances once the police seize things, you may not want the police involved in seizing your items. So I don't think there's proof here that Mr. Barnhardt had specific knowledge of what's in a shaving . . . container . . . . The Court may say, "Well, I'm not here to decide the legality of a search," in terms of the question is was there probable cause to believe he was in possession of drugs. But when you have an instance when it's clear the police did not have the authority to conduct a search in the manner in which they conducted their search, that . . . now we're going to impose a very severe sanction upon Mr. Barnhardt by having him detained pending the outcome of this case[.] |

Tr. 42:24-45:6. Responding to counsel's argument, Magistrate Judge Facciola stated:

The question of the search is not before me. With reference to the argument [counsel] made, I find probable cause to believe [Barnhardt] committed the crime charged.

As I indicated, there is a moment in time when [Barnhardt] viewed a man coming at him, who has the word "Police" written across his chest. At that point, he causes a black object to go flying through the air and land in the back of the truck. In the back of the truck there are two objects. One obviously is impossible in being flipped in that way, it's a car battery. The other is the object which the officer seizes and finds the drugs. I believe that a reasonable person could find on those facts that there was a willful attempt to get rid of the object before the police could get it, and that would be evidence in itself from which a jury can draw the conclusion that the person who threw the object had knowledge of its contents.

> Therefore, I find probable cause to believe that [Barnhardt] knowingly possessed a
> controlled substance with intent to distribute it.

Tr. 48:2-22. The government then presented the case to a grand jury, which returned an

indictment on March 11, 2004. Indictment, *United States v. Barnhardt*, No. 04cr132 (D.D.C.

Mar. 11, 2004).

After his arraignment, Barnhardt moved to suppress the drug evidence seized at the time

of his arrest. *See* Def.'s Mot. to Suppress Physical Evidence, *United States v. Barnhardt*, No.

04cr132 (D.D.C. Mar. 25, 2004). He argued that the officers "acted without the authority of a

warrant and . . . did not have probable cause to arrest [him]." *Id.* ¶ 4. According to Barnhardt,

the officers not only lacked probable cause but also lacked "a reasonable articulable suspicion to

believe that [he] was or had been engaged in criminal activity." *Id.* ¶ 5. The government

opposed the motion, contending that: (1) Barnhardt had no legitimate expectation of privacy and

thus lacked standing to challenge the search of the pickup truck or the black bag, (2) Barnhardt

abandoned the bag and thus lacked standing to challenge the recovery of drugs from it, (3) the

officers conducted a reasonable search of Barnhardt's person and the area within his immediate

access, and (4) the officers had probable cause to believe that the pickup truck and the black bag

contained evidence of a crime and therefore could search the truck under the automobile

exception to the warrant requirement. Gov't's Opp'n to Def. Barnhardt's Mot. to Suppress

Physical Evidence, *United States v. Barnhardt*, No. 04cr132 (D.D.C. Apr. 30, 2004) at 3-8.

After an evidentiary hearing and argument, Judge Friedman granted the motion to

suppress. *See* Order, *United States v. Barnhardt*, No. 04cr132 (D.D.C. May 18, 2004). Judge

Friedman considered and rejected each of the government's arguments. *See generally* Transcript

of Ruling ("Tr. of Ruling"), *United States v. Barnhardt*, No. 04cr132 (D.D.C. Aug. 12, 2004).

First, on the issue of standing, he considered whether Barnhardt had a legitimate expectation of privacy in the area searched or a proprietary interest in the property seized. Tr. of Ruling at 13:4-6. Judge Friedman found that Barnhardt had an ownership interest in the house and property, but not in the truck, *id.* at 15:6-7, and had a possessory interest in the scale containing his fingerprint, *id.* at 15:8-10. Judge Friedman concluded that, "when he's at his own home, in his own driveway, coming out of his own house, where there is a truck that is there not on one but on numerous . . . occasions . . . where his sister arrives to visit and pulls in behind that truck," and where the bag had been in Barnhardt's hands and the scale had his fingerprint on it, Barnhardt must "have standing to raise Fourth Amendment claims." *Id.* at 17:13-23. Judge Friedman then considered whether Barnhardt forfeited any expectation of privacy he might have had by tossing the bag away. He found that Barnhardt had remained next to the vehicle, Tr. of Ruling at 18:21-22, and "it doesn't seem plausible that he abandoned a piece of property that he had put into a vehicle parked in the driveway of his own home, which vehicle itself was blocked from exiting by his sister's SUV," *id*. at 18:24-19:2.

Next, Judge Friedman considered whether, under *Terry v. Ohio*, 392 U.S. 1 (1968), Sloan and Ramadhan lawfully detained Barnhardt and searched him and the area immediately surrounding him. *See* Tr. of Ruling at 19:14-23:25. Judge Friedman observed that Sloan and Ramadhan were suspicious because of Barnhardt's background, his brother's history, and the fact that Barnhardt fled on an earlier occasion, and that the tossing of the bag caused Ramadhan to go see what the bag was. *Id.* at 20:23-21:5. But Judge Friedman noted that Barnhardt was unarmed, had placed his tools on the ground, and stood over 15 feet from the bag, which tended

to show that "this search was not reasonably limited in scope to the accomplishment of the only goal which might conceivably have justified its inception, the protection of the officer[s]." *Id.* at 12:23-25. Moreover, Judge Friedman was not convinced that suspicions about Barnhardt's prior attempt to avoid service of a subpoena or the alleged drug activity of Barnhardt's brother would justify seizure of the bag – Ramadhan "really didn't invoke the safety rationale for even picking [the bag] up, and he certainly didn't invoke the safety rationale for opening it. He had no reason to open it." *Id.* at 22:12-14. Hence, "[t]here was no justifiable reason, no reasonable suspicion, no probable cause to open the pouch." *Id.* at 23:12-14.

Lastly, Judge Friedman rejected the government's argument that the automobile exception to the warrant requirement applied. Tr. of Ruling at 24:4-7. He found that the exception "is based on the mobility of vehicles," *id.* at 24:12, and that the truck could not be moved because it was blocked in by two other vehicles, *id.* at 24:15-18.

Barnhardt apparently remained in custody pending the government's appeal of Judge Friedman's ruling, which was dismissed on the government's motion. Order, *United States v. Barnhardt*, No. 04-3077 (D.C. Cir. Aug. 13, 2004). The government then moved to dismiss the indictment. Gov't's Mot. to Dismiss, *United States v. Barnhardt*, No. 04cr132 (D.D.C. Aug. 17, 2004). Judge Friedman granted the motion, *see* Order, *United States v. Barnhardt*, No. 04cr132 (D.D.C. Sept. 2, 2004), and Barnhardt was released from custody, *see* Order for Release of Defendant, *United States v. Barnhardt*, No. 04cr132 (D.D.C. Sept. 2, 2004).

### C. Counts of the Amended Complaint

Barnhardt brings this civil rights action against the District of Columbia and against Sloan and Ramadhan in their individual capacities under 42 U.S.C. §§ 1981 and 1983 and *Bivens*

*v. Six Unknown Named Agents of Fed. Bureau of Narcotics*, 403 U.S. 388 (1971). He asserts several claims in six counts.[4]

In Count 1, Barnhardt alleges that Sloan and Ramadhan "orchestrated their arrival at [his] home in order to 'plant' evidence" in retaliation for the December 15, 2003 encounter, in violation of the Fourth and Fifth Amendments to the United States Constitution.[5] Am. Compl. ¶¶ 21-22. In Count 2, he alleges that defendants "detained, handcuffed and arrested" him, resulting in his being "jailed without bond on the federal drug charges from February 13, 2004 through September 2, 2004," the time period for which he "seeks compensation[.]" *Id.* ¶ 24. Counts 1 and 2 comprise Barnhardt's constitutional claims for false arrest and false imprisonment. And in Count 3, Barnhardt alleges that Sloan and Ramadhan "conspired to falsely arrest [him]." Am. Compl. ¶ 26.

He then alleges in Count 4 that the District of Columbia, "pursuant to official policy and custom, . . . knowingly, or negligently failed to instruct, supervise, control and discipline [Sloan and Ramadhan] in the performance of their duties," such that the officers "were permitted to conspire to falsely arrest [Barnhardt] for their personal motives." *Id.* ¶ 34. And in Count 5, Barnhardt alleges that Sloan and Ramadhan caused him to be subjected to a strip search, first outside his home and then at headquarters downtown. *Id.* ¶ 37. Lastly, Barnhardt alleges in

---

[4]     Barnhardt's common law claims for false arrest, false imprisonment, assault, intentional infliction of emotional distress, malicious prosecution, abuse of process, and unlawful entry or trespassing have been dismissed, as were his claims against former Mayor Anthony Williams and former MPD Chief Charles Ramsey. *Barnhardt v. Dist. of Columbia*, 560 F. Supp. 2d 15, 19-20 (D.D.C. 2008).

[5]     The Fourteenth Amendment does not apply to the District of Columbia, *see Bolling v. Sharpe*, 347 U.S. 497, 498 (1954), and Barnhardt's claims under the Fourteenth Amendment will be dismissed.

Count 6 that Sloan and Ramadhan "targeted [him] for the arrest based on his status as an African American." *Id.* ¶ 39.

## II.  DISCUSSION

### *A.  Summary Judgment Standard*

The Court may grant a motion for summary judgment "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). The moving party bears the burden of demonstrating the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). Factual assertions in the moving party's affidavits may be accepted as true unless the opposing party submits his own affidavits, declarations or documentary evidence to the contrary. *Neal v. Kelly*, 963 F.2d 453, 456 (D.C. Cir. 1992).

"[I]n responding to a proper summary judgment motion, the nonmoving party, 'by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial.'" *Bush v. Dist. of Columbia*, 595 F.3d 384, 387 (D.C. Cir. 2010) (quoting Fed. R. Civ. P. 56(e)). "Mere allegations or denials of the adverse party's pleading are not enough to prevent the issuance of summary judgment." *Williams v. Callaghan*, 938 F. Supp. 46, 49 (D.D.C. 1996). The adverse party must do more than simply "show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). Instead, while the movant bears the initial responsibility of identifying those portions of the record that demonstrate the absence of a genuine issue of material fact, the burden shifts to the non-movant to "come forward with 'specific facts showing

that there is a *genuine issue for trial*.'" *Id.* at 587 (citing Fed. R. Civ. P. 56(e)) (emphasis in original).

Although a court should draw all favorable inferences from the supporting records submitted by the nonmoving party, the mere existence of a factual dispute, by itself, is not sufficient to bar summary judgment. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). To be material, the factual assertion must be capable of affecting the substantive outcome of the litigation; to be genuine, the issue must be supported by sufficient admissible evidence that a reasonable trier of fact could find for the nonmoving party. *Laningham v. United States Navy*, 813 F.2d 1236, 1242-43 (D.C. Cir. 1987); *Liberty Lobby*, 477 U.S. at 251 (stating that the court must determine "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law").

### B. Collateral Estoppel (Issue Preclusion)

Defendants move for summary judgment primarily on the ground that the doctrine of collateral estoppel, or issue preclusion, bars relitigation of the issue of probable cause for Barnhardt's arrest. *See* Defs.' Mot. at 6-10. According to defendants, "[t]he undisputed facts show that, following a full and fair hearing on the issue of probable cause in which [p]laintiff was represented by counsel, a court of competent jurisdiction found probable cause for [p]laintiff's February 13, 2004 arrest." *Id.* at 10. If Barnhardt cannot revisit the issue of probable cause for his arrest, defendants assert, his remaining claims also fail because they "are dependent on the alleged false arrest and imprisonment claims." *Id.* at 6.

"The Supreme Court has defined issue preclusion to mean that 'once a court has decided

an issue of fact or law necessary to its judgment, that decision may preclude relitigation of the issue in a suit on a different cause of action involving a party to the first case.'" *Yamaha Corp. of Am. v. United States*, 961 F.2d 245, 254 (D.C. Cir. 1992) (quoting *Allen v. McCurry*, 449 U.S. 90, 94 (1980)).  "To preclude parties from contesting matters that they have had a full and fair opportunity to litigate protects their adversaries from the expense and vexation attending multiple lawsuits, conserves judicial resources, and fosters reliance on judicial action by minimizing the possibility of inconsistent decisions."  *Montana v. United States*, 440 U.S. 147, 153-54 (1979).  The doctrine applies to civil rights actions under § 1983, *see Allen*, 449 U.S. at 96, and a finding in a criminal proceeding may bar a party from relitigating the same issue in a subsequent civil action, *Emich Motors Corp. v. Gen. Motors Corp.*, 340 U.S. 558, 568-69 (1951) (holding that "plaintiffs are entitled to introduce the prior judgment to establish prima facie all matters of fact and law necessarily decided by the conviction and verdict on which it was based"); *Otherson v. Dep't of Justice*, 711 F.2d 267, 271 (D.C. Cir. 1983) (stating that "issues determined in connection with a criminal conviction may be taken as preclusively established for the purposes of later civil trials") (citations omitted); *see also Allen*, 449 U.S. at 105 (applying collateral estoppel in a § 1983 action based on factual claims litigated in an earlier criminal trial).

In order for collateral estoppel to apply, three elements must be shown:

> [1], the same issue now being raised must have been contested by the parties and submitted for judicial determination in the prior case[; 2], the issue must have been actually and necessarily determined by a court of competent jurisdiction in that prior case[; and 3], preclusion in the second case must not work a basic unfairness to the party bound by the first determination.

*Martin v. Dep't of Justice*, 488 F.3d 446, 454 (D.C. Cir. 2007) (quoting *Yamaha Corp.*, 961 F.2d

at 254).  In this case, collateral estoppel is asserted defensively, that is, to prevent litigation of an issue plaintiff previously litigated and lost, and defendants may assert collateral estoppel as a defense even though they were not bound by the prior judgment.  *See McCord v. Bailey*, 535 F.2d 606, 609 n.1 (D.C. Cir. 1980).

Although "[t]he objective of the doctrine of . . . collateral estoppel . . . is judicial finality," *Yamaha Corp.*, 961 F.2d at 254, not all prior determinations have preclusive effect. For example, issues litigated in the context of a preliminary injunction traditionally would not form a basis for collateral estoppel.  *See Kuznich v. County of Santa Clara*, 689 F.2d 1345, 1350-51 (9th Cir. 1983).  However, "recent decisions have relaxed traditional views of the finality requirement in the collateral estoppel context by applying the doctrine to matters resolved by preliminary rulings or to determinations of liability that have not yet been completed by an award of damages or other relief, let alone enforced."  *In re Nangle*, 274 F.3d 481, 484-85 (8th Cir. 2001) (citations and internal quotation marks omitted).  The doctrine may apply, then, where the findings made in the prior proceeding are "sufficiently firm" to remove any compelling reason to permit relitigation of the issues.  *Hawksbill Sea Turtle v. FEMA*, 126 F.3d 461, 474 n.11 (3d Cir. 1997); *see Christo v. Padgett*, 223 F.3d 1324, 1339 (11th Cir. 2000) (preliminary findings with respect to a proposed settlement); *Haupt v. Dillard*, 17 F.3d 285, 288-89 (9th Cir. 1994) (probable cause determination at a criminal preliminary hearing).  Finality for purposes of collateral estoppel "may mean little more than that the litigation of a particular issue has reached such a stage that a court sees no really good reason for permitting it to be litigated again."  *In re Brown*, 951 F.2d 564, 569 (3d Cir. 1991) (internal quotation marks and citations omitted).

Defendants' collateral estoppel argument based on the probable cause determination at a

criminal preliminary hearing is not without support in case law. For example, in *Coogan v. City of Wixom*, 820 F.2d 170 (6th Cir. 1987), *overruled on other grounds by Frantz v. Vill. of Bradford*, 245 F.3d 869, 874 (6th Cir. 2001), a state district judge had conducted a preliminary hearing at which Coogan was represented by counsel, who cross-examined 14 out of 15 witnesses produced by the prosecutor. 820 F.2d at 172. The judge found probable cause and bound Coogan over for trial in the state circuit court, where Coogan filed a motion to quash the criminal charge in order "to have the circuit court judge reexamine the issue of probable cause." *Id.* After a hearing, the state circuit court found no basis for overturning the lower court decision. *Id.* In the subsequent federal § 1983 case, the Sixth Circuit concluded that Coogan was "collaterally estopped from raising the issue of probable cause," since he had had a full and fair opportunity to litigate the issue at an earlier state proceeding. *Id.* at 175. The court concluded that, where a preliminary hearing under Michigan law offered "an opportunity to contest probable cause . . . and the accused does so, a finding of probable cause by the examining . . . state judge should foreclose relitigation of that finding in a subsequent § 1983 action." *Id.*

The Seventh Circuit similarly applied collateral estoppel in *Guenther v. Holmgreen*, 738 F.2d 879 (7th Cir. 1984). After an evidentiary hearing, the state trial court found probable cause to arrest and denied a motion to dismiss. 738 F.2d at 881. A jury then found Guenther not guilty of disorderly conduct; it was unable to reach a verdict on the charge of resisting arrest. *Id.* He filed a § 1983 action claiming that the arrest was made without probable cause and was based on the arresting officer's misrepresentations. *Id.* The Seventh Circuit construed the claim as an attack on both the sufficiency and the integrity of the evidence supporting the probable cause determination. *Id.* at 884. Guenther, who was represented by counsel, had raised and litigated

probable cause at the preliminary hearing "by attempting to show that the events [the arresting officer] relied on to establish probable cause actually occurred after the arrest had taken place," by "thoroughly litigat[ing] and challeng[ing] the veracity of [the arresting officer] and the other prosecution witnesses who supplied the bases for probable cause," and by calling a rebuttal witness of his own. *Id.* And the state court's determination of probable cause "actually and necessarily entailed the rejection of [Guenther's] challenges to [the arresting officer's] veracity, integrity, and good faith," *id.* (internal quotation marks omitted), in "a much more extensive and probing hearing" than ordinarily would occur, *id.* at 886.

More recently, in *Flowers v. City of Detroit*, 306 Fed. Appx. 984 (6th Cir. 2009), the plaintiff brought claims of false arrest and false imprisonment in a § 1983 action following the dismissal of criminal charges against him. *Id.* at 985, 987. At the preliminary hearing in the criminal case, plaintiff's counsel had declined an opportunity to cross-examine the prosecution's witnesses and, after argument from both sides, the state judge had found probable cause and bound the plaintiff over for trial. *Id.* at 986-87. The federal court granted the defendants' motion for summary judgment in the subsequent civil rights action, "finding that [the plaintiff] was precluded from arguing lack of probable cause for his arrest – an element of each of his claims – by collateral estoppel arising from a state court judgment on the issue of probable cause," and the Sixth Circuit affirmed. *Id.* And in *Craig v. City of Hobart*, No. 09-0053, 2010 WL 680857 (W.D. Okla. Feb. 24, 2010), the plaintiff brought claims of false arrest, but he was barred from relitigating the issue of probable cause for his arrest because the issue already had been decided at the preliminary hearing in the underlying state criminal matter. *Id.*, 2010 WL 680857, at *4. The court interpreted Oklahoma law as directing that an order binding a criminal

defendant for trial "precludes relitigation of the issue of probable cause in a subsequent civil suit for false arrest following acquittal." *Id.* (citation omitted).

Here, the parties do not dispute that Magistrate Judge Facciola found probable cause to believe that Barnhardt committed the drug offense with which he was charged. *See* Defs.' Mem. at 7; Pl.'s Opp'n at 3. But that finding does not necessarily have preclusive effect in this subsequent civil rights action following dismissal of the criminal case. Rather, each element of collateral estoppel must be assessed based on the facts and circumstances present.

      1.     Was the same issue previously raised in the prior case?

The probable cause finding at the preliminary hearing will have preclusive effect only if the issue before Magistrate Judge Facciola was the same issue now before the Court in this case. At a preliminary hearing in federal court, a magistrate judge "determine[s] whether there is probable cause to believe that an offense has been committed and that the arrested person has committed it." 18 U.S.C. § 3060(a); *see United States v. Hinkle*, 307 F. Supp. 117, 120 (D.D.C. 1969) ("[T]he directive of Sec. 3060(a) is clear and definite; as regards the function of the preliminary hearing, subsection (a) provides that 'a preliminary examination shall be held . . . to determine whether there is probable cause to believe that an offense has been committed and that the arrested person has committed it.'"). "It has generally been thought that the purpose of a preliminary hearing is to afford the accused (1) an opportunity to establish that there is no probable cause for his continued detention and thereby to regain his liberty and, possibly, escape prosecution, and (2) a chance to learn in advance of trial the foundations of the charge and the evidence that will comprise the government's case against him." *Blue v. United States*, 342 F.2d 894, 901 (D.C. Cir. 1964); *accord*, *Ross v. Sirica*, 380 F.2d 557, 559 (D.C. Cir. 1967). The first

purpose of the preliminary hearing is at issue here.

To be sure, there are circumstances in which a probable cause determination at a preliminary hearing will have no preclusive effect because the issue presented there is not the same as the issue later presented in the § 1983 action. For example, where the later attack is on the integrity of the evidence supporting the earlier probable cause determination, that prior determination may have no preclusive effect. In *Hinchman v. Moore*, 312 F.3d 198 (6th Cir. 2001), a state court judge found probable cause for an arrest on a felony assault charge based on the testimony of two arresting officers. *Id.* at 201. After her acquittal, Hinchman filed a § 1983 action claiming, *inter alia*, false arrest and false imprisonment. *Id.* at 201. She contended that the officers supplied false information to the prosecutors and to the state court, *id.* at 202, a claim characterized by the Sixth Circuit as a challenge to the integrity of the evidence supporting the probable cause determination. *See id.* at 203. Bound by its precedent, *see Darrah v. City of Oak Park*, 255 F.3d 301 (6th Cir. 2001), the Sixth Circuit concluded that an identity of issues was lacking, reasoning that the preliminary hearing dealt with the sufficiency of evidence, while Hinchman's § 1983 claims pertained to the integrity of the evidence upon which the probable cause determination was made. *See* 312 F.3d at 203.

A similar result was reached in *Schertz v. Waupaca County*, 875 F.2d 578 (7th Cir. 1989). There, at a preliminary hearing the state judge found probable cause to bind the plaintiff over for trial. 875 F.2d at 579. Following acquittal on all charges, Schertz filed a § 1983 action claiming that he had been arrested and detained without probable cause. *Id.* at 580. He did not attack the sufficiency of the evidence supporting the probable cause determination; rather, "his theory [was] that the flaws in the murder investigation demonstrate[d] the defendants' bad faith .

. . thereby negat[ing] the existence of probable cause." *Id.* at 581. The Seventh Circuit held that because Schertz's theory was "more accurately characterized as a challenge to the integrity of the evidence than its sufficiency, identity of the issues [was] lacking," and hence the prior probable cause determination had no preclusive effect. *Id.*[6]

On the other hand, as reflected in the cases discussed earlier, the Sixth and Seventh Circuits both recognize that a probable cause determination may have preclusive effect. In *Whitley v. Seibel*, 676 F.2d 245 (7th Cir. 1982), the Seventh Circuit "conceded that there will be identical issues in a preliminary hearing and a [§] 1983 action when only the legality of the arrest is at issue." 676 F.2d at 249. And the Sixth Circuit in *Hinchman* noted that "not every criminal defendant turned civil plaintiff will prevail in a § 1983 action based on malicious prosecution or a similar claim after being acquitted on criminal charges." *Hinchman*, 312 F.3d at 203. Where plaintiff had an opportunity to cross-examine the government's witnesses and to testify himself, courts should not necessarily "allow [a § 1983 plaintiff] a second bite at the probable-cause apple, a result that is diametrically opposed to the collateral-estoppel concept." *Id.*

Barnhardt principally relies on two points: that Judge Friedman granted his motion to suppress and that the criminal case consequently was dismissed. *See* Pl.'s Opp'n at 5. That may

---

[6]     In *Williams v. Kobel*, 789 F.2d 463 (7th Cir. 1986), the Seventh Circuit concluded that the applicable Illinois statute governing preliminary hearings "[did] not require the judge to evaluate the presence or absence of probable cause at the time of the arrest," and "absent a motion challenging the validity of the arrest, the presiding judicial official bases the probable cause to bindover determination on evidence exclusively presented at the hearing and does not and should not consider the separate issue of whether there was probable cause to arrest the defendant." 789 F.2d at 468. The preliminary examination determination, then, had no preclusive effect for two reasons – whether there was probable cause to arrest the plaintiff was not at issue at the preliminary hearing and the officers did not have a full and fair opportunity to litigate probable cause there. *Id.* at 470.

not always be enough.  But here,  Barnhardt's account of the facts giving rise to his arrest

contrasts markedly with Ramadhan's account, and he challenges Ramadhan's veracity by

denying ownership or possession of the black shaving bag, by testifying that Ramadhan planted

the bag, and by denying any knowledge of the bag's contents.  If Barnhardt's account is to be

believed, Ramadhan lied about what he observed.  And Judge Friedman's ruling undermines

Ramadhan's rationale, such as it was, for retrieving and searching the shaving bag.  The officers

could have accomplished the purpose of their visit to Barnhardt's home – simply to serve him

with a subpoena – once they had verified Barnhardt's identity and determined that he did not

pose a threat to their safety.  But for the search that was subsequently deemed unconstitutional

by Judge Friedman, Barnhardt would not have been arrested on the drug charge.

 Barnhardt's circumstances, then, are closer to those in *Hinchman* and *Schertz* than to the

cases finding collateral estoppel.  The former plaintiffs directly challenged the basis on which

the arresting officers decided to arrest, thereby attacking the integrity (or quality) of the evidence

on which the arrests were made.  However, the sole issue at each preliminary hearing was the

sufficiency (or quantum) of the evidence.  In *Hinchman*, the plaintiff's issue was "whether the

detectives . . . supplied the prosecutor's office and the state court with a false version of the

facts" supporting her arrest for felonious assault, while the issue at the preliminary hearing

"concerned probable cause to arrest and prosecute her."  312 F.3d at 202.  Similarly, in *Schertz*,

"[t]he preliminary hearing concerned the sufficiency of the evidence to establish probable

cause," but the claim in the subsequent § 1983 action was "more accurately characterized as a

challenge to the integrity of the evidence than to its sufficiency."  875 F.2d at 581.

Barnhardt's success on the suppression motion came about when Judge Friedman

reviewed the arresting officers' motivation and purported rationale for searching the black

shaving bag, found no ground for conducting the search, and thus undermined the basis for

Barnhardt's arrest on the drug charge. Judge Friedman's ruling, then, supports the conclusion

that the probable cause finding at the preliminary hearing has no collateral estoppel effect. As in

*Hinchman*, Barnhardt challenges the accuracy or veracity of law enforcement's version of the

facts which, in the words of *Schertz*, is better described "as a challenge to the integrity of the

evidence than to its sufficiency." *Schertz*, 875 F.2d at 581. Identity of the issues is lacking here,

therefore, because the issue of probable cause at the criminal preliminary hearing is not the same

issue raised in this civil rights suit.

    2.      Was the issue now presented actually and necessarily determined by a
             court of competent jurisdiction in the prior criminal case?

One violates 18 U.S.C. § 841(a)(1), the offense with which Barnhardt was charged, if one

knowingly possesses cocaine with an intent to distribute it. *See, e.g., United States v. Burch*, 156

F.3d 1315, 1324 (D.C. Cir. 1998) ("To establish the requisite elements on the possession count,

the government needed to prove that appellant possessed crack cocaine knowingly and

intentionally, and that when he possessed the cocaine he had a specific intent to distribute it.").

Having heard Ramadhan's testimony at the preliminary hearing, Magistrate Judge Facciola

found that there was sufficient evidence from which a jury could conclude that Barnhardt

knowingly possessed cocaine with intent to distribute it – i.e., that there was probable cause to

arrest and hold Barnhardt for that offense. But Magistrate Judge Facciola's finding did not

require that he probe Ramadhan's motivation for conducting the search, and he did not have the

benefit of the testimony of any other witness. Nor was it within his jurisdiction to rule on the

constitutionality of the search leading to Barnhardt's arrest. The issue presented in this civil

rights action – the integrity of the evidence upon which the probable cause determination was made – was not presented earlier, and it follows that the issue was not actually and necessarily determined at the prior criminal proceeding.

       3.      Does preclusion here work a basic unfairness to Barnhardt?

Generally, collateral estoppel does not apply where the party against whom the defense is asserted did not have a full and fair opportunity to litigate the issue in a prior proceeding. *See Haring v. Prosise*, 462 U.S. 306, 313 (1983); *Blonder-Tongue Labs., Inc. v. Univ. of Ill. Found.*, 402 U.S. 313, 333 (1971) (noting that, before a defense of collateral estoppel can prevail, a plaintiff "must be permitted to demonstrate, if he can, that he did not have a fair opportunity procedurally, substantively and evidentially to pursue his claim the first time"); *Kinslow v. Ratzlaff*, 158 F.3d 1104, 1106 (10th Cir. 1998) (concluding that police officers sued in their individual capacities were "neither parties nor privies to the prior state court determination and, therefore, did not have a full and fair opportunity to litigate in state court the constitutionality of the issues in this [§] 1983 action").

In the criminal case, the preliminary hearing was rescheduled in order to accommodate Barnhardt's counsel, who then cross-examined the sole government witness. That cross-examination probed whether Ramadhan actually saw or could have seen the small black bag in Barnhardt's hand and then tossed by Barnhardt. The cross-examination also highlighted the fact that the officers could have served Barnhardt with the subpoena as soon as they verified his identity and that they could have then left the scene. Barnhardt's counsel presented arguments to Magistrate Judge Facciola resisting a probable cause finding. And although counsel had an opportunity to produce evidence in Barnhardt's defense, he declined to do so. These factors in

combination suggest that Barnhardt had a full and fair opportunity at the preliminary hearing to litigate the issue of probable cause and that he had adequate incentive to do so, since a ruling in his favor could have brought about his release. *See, e.g., Flowers*, 306 Fed. Appx. at 986; *Guenther*, 738 F.2d at 886; *Trepanier v. City of Blue Island*, No. 03-C-7433, 2008 WL 4442623, at *2 (N.D. Ill. Sept. 29, 2008). Still, Magistrate Judge Facciola observed that "the question of the search" was not before him, thus indicating that Barnhardt did not have a full and fair opportunity to litigate the relevant issue, and that preclusion would be unfair to him.

The issue now raised in this civil rights action focuses on the integrity of the evidence relating to probable cause for the search and Barnhardt's subsequent arrest, not on its sufficiency as was the case at the criminal preliminary hearing. Hence, the first element required for application of collateral estoppel is not present – the same issue is not being contested. And ultimately it would be unfair to apply collateral estoppel against Barnhardt here, as it amounts to a rejection of his version of events, which was not previously litigated and decided against him. On the facts and circumstances of this case, then, collateral estoppel does not bar relitigation of the issue of probable cause for Barnhardt's arrest.

## C. Qualified Immunity

Sloan and Ramadhan argue that there was probable cause for Barnhardt's arrest and hence no violation of his Fourth Amendment rights, and, therefore, that qualified immunity protects them from suit. Because qualified immunity is "an *immunity from suit* rather than a mere defense to liability, . . . it is effectively lost if a case is erroneously permitted to go to trial." *Mitchell v. Forsyth*, 472 U.S. 511, 526 (1985) (emphasis in original). Accordingly, courts must "resolv[e] immunity questions at the earliest possible stage in litigation." *Hunter v. Bryant*, 502

U.S. 224, 227 (1991) (per curiam).

"[G]overnment officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). "Qualified immunity balances two important interests – the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably." *Pearson v. Callahan*, 129 S. Ct. 808, 815 (2009). This protection is afforded to government officials whether their "error is a mistake of law, a mistake of fact, or a mistake based on mixed questions of law and fact." *Id*. (citations and internal quotation marks omitted); *see Brinegar v. United States*, 338 U.S. 160, 177 (1949) ("Because many situations which confront officers in the course of executing their duties are more or less ambiguous, room must be allowed for some mistakes on their part. But the mistakes must be those of reasonable men, acting on facts leading sensibly to their conclusions of probability."); *see also Anderson v. Creighton*, 483 U.S. 635, 661 (1987) (Stevens, J., dissenting) ("The concept of probable cause leaves room for mistakes, provided always that they are mistakes that could have been made by a reasonable officer."). "[A]ll but the plainly incompetent or those who knowingly violate the law" may enjoy the protection of qualified immunity. *Malley v. Briggs*, 475 U.S. 335, 341 (1986).

In *Saucier v. Katz*, 533 U.S. 194 (2001), the Supreme Court set forth a two-step analysis for resolving government officials' qualified immunity claims. First, the court decides "whether the facts that a plaintiff has alleged or shown make out a violation of a constitutional right." *Id.* at 201. If the plaintiff satisfies this first step, the court then decides whether the right at issue

was clearly established at the time of the defendant's alleged misconduct. *Id*. The sequence of this analysis no longer is mandatory, and now the courts may "exercise their sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand." *Pearson*, 129 S. Ct. at 818.

With respect to the second prong of the analysis, "[i]t is well settled that an arrest without probable cause violates the [F]ourth [A]mendment," *Martin v. Malhoyt*, 830 F.2d 237, 262 (D.C. Cir. 1987) (citing *Gerstein v. Pugh*, 420 U.S. 103, 111 (1975)), and Barnhardt's right to be free from an unreasonable search and seizure was clearly established in February 2004. The central question is whether the facts alleged, taken in the light most favorable to Barnhardt, show that Ramadhan's and Sloan's conduct violated a constitutional right. *See Saucier*, 533 U.S. at 201.

### 1. Probable Cause as a Defense to False Arrest

There is "no real difference as a practical matter between false arrest and false imprisonment[,]" *Shaw v. May Dep't Stores Co.*, 268 A.2d 607, 609 n.2 (D.C. 1970) (citations omitted), and "[t]he gist of any complaint for false arrest or false imprisonment is an unlawful detention," *Dent v. May Dep't Stores Co.*, 459 A.2d 1042, 1044 (D.C. 1982) (internal quotation marks and citation omitted). The elements of a common law false arrest claim and a constitutional false arrest claim are practically identical. *See McCarthy v. Kleindienst*, 741 F.2d 1406, 1413 (D.C. Cir. 1984) ("While the false arrest claim is asserted under both the Fourth Amendment and the common law, the requisite elements in both cases are that the plaintiff was arrested against his will and that the arrest was unlawful."); *Scott v. Dist. of Columbia*, 101 F.3d 748, 753 (D.C. Cir. 1997).

Under District of Columbia law, false imprisonment "is defined as the unlawful detention

of a person without a warrant or for any length of time whereby he is deprived of his personal liberty or freedom of locomotion; it may be caused by actual force, or by fear of force, or even by words." *Tocker v. Great Atl. & Pac. Tea Co.*, 190 A.2d 822, 824 (D.C. 1963). To prevail, a plaintiff must demonstrate "that the police acted without probable cause, in an objective constitutional sense, to effectuate his arrest." *Taylor v. Dist. of Columbia*, 691 A.2d 121, 125 (D.C. 1997) (citing *Welch v. Dist. of Columbia*, 578 A.2d 175, 176 (D.C. 1990)).

The standard for arrest is probable cause, *Gerstein,* 420 U.S. at 112, which denotes "facts and circumstances within the officer's knowledge that are sufficient to warrant a prudent person, or one of reasonable caution, in believing, in the circumstances shown, that the suspect has committed, is committing, or is about to commit an offense." *Michigan v. DeFillippo*, 443 U.S. 31, 37 (1979). It is a "practical, nontechnical conception," *Brinegar*, 338 U.S. at 176, factoring in "the factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act," *id.* at 175. "Whether probable cause exists depends upon the reasonable conclusion to be drawn from the facts known to the arresting officer at the time of the arrest." *Devenpeck v. Alford*, 543 U.S. 146, 152 (2004) (citing *Maryland v. Pringle*, 540 U.S. 366, 371 (2003)). The arresting officer's state of mind is not relevant in determining whether probable cause exists, *Devenpeck*, 543 U.S. at 152, and his "subjective motive does not invalidate objectively reasonable behavior under the Fourth Amendment," *Oberwetter v. Hilliard*, 680 F. Supp. 2d 152, 167 (D.D.C. 2010).

"[A] warrantless arrest by a law officer is reasonable under the Fourth Amendment where there is probable cause to believe that a criminal offense has been or is being committed." *Devenpeck*, 543 U.S. at 152 (citations omitted). If an arrest is justified, then the arresting officer

is protected by qualified immunity and the damages action against him fails.[7]  *See Dellums v. Powell*, 566 F.2d 167, 175 (D.C. Cir. 1977) (citation omitted); *Saucier*, 533 U.S. at 207; *see also Pierson v. Ray*, 386 U.S. 547, 557 (1967) (holding that "the defense of good faith and probable cause . . . is . . . available to the officers in the action under § 1983").  Hence, the central inquiry in this case is whether Sloan and Ramadhan were justified in arresting Barnhardt.  *See Bolger v. Dist. of Columbia*, 608 F. Supp. 2d 10, 18  (D.D.C. 2009) (citing *Dellums*, 566 F.2d at 175).

> 2.  On the Present Record, Ramadhan Is Not Entitled to Qualified Immunity

While there is no dispute that the bag contained crack cocaine, razors, and a scale bearing Barnhardt's fingerprint, the parties dispute the means by which the bag found its way into the back of the pickup truck.  Barnhardt claims that Ramadhan planted it; Ramadhan claims that Barnhardt tossed it there.  If Barnhardt's version is to be believed, there could not have been probable cause for his arrest, which was based solely on the alleged discovery of drugs and drug paraphernalia inside the bag.  If Ramadhan's version is credited, there still remains an open question as to whether, under all the circumstances, probable cause existed for Barnhardt's arrest.        The Court is reluctant to issue a ruling suggesting that a genuine issue of material fact exists any time a plaintiff's version of events differs markedly from the defendant's version

---

[7]        Barnhardt appears to argue that the decision to grant the motion to suppress evidence and then dismiss the indictment trumps the probable cause determination reached by Magistrate Judge Facciola at the prior preliminary hearing.  *See* Pl.'s Opp'n at 6.  Not so.  The ultimate resolution of the criminal charges is not determinative, as the qualified immunity analysis focuses solely on the facts and circumstances surrounding the arrest itself.  *See Gerstein*, 420 U.S. at 112; *DeFillippo*, 443 U.S. at 36 ("The validity of the arrest does not depend on whether the suspect actually committed a crime; the mere fact that the suspect is later acquitted of the offense for which he is arrested is irrelevant to the validity of the arrest.").  Likewise, unless it has collateral estoppel effect – which the Court has concluded it does not – the dismissal based on the suppression of evidence is not determinative of the probable cause inquiry for purposes of qualified immunity.

with respect to probable cause. *Cf. Ayers v. City of Holly Springs*, No. 05-cv-75, 2006 WL 2943295, at *4 (N.D. Miss. Oct. 13, 2006). But the competing versions of the facts here are not "so replete with inconsistencies and improbabilities that no reasonable juror would undertake the suspension of disbelief necessary to credit the allegations made in [Barnhardt's] complaint." *Jeffreys v. City of New York*, 426 F.3d 549, 555 (2d Cir. 2005). As to Ramadhan, then, the Court is presented with "a classic 'he said, she said' (in this case 'he said, he said') situation in which summary judgment is inappropriate because the facts are in diametric opposition." *Jones v. Tozzi*, No. 05-cv-0148, 2007 WL 433116, at *11 (E.D. Cal. Feb. 7, 2007). Resolution of these factual issues depends on credibility determinations which the Court cannot make on summary judgment. Hence, the assertion that Ramadhan is protected by qualified immunity must be rejected. *See, e.g., DeVentura v. Keith*, 169 F. Supp. 2d 390, 398 (D. Md. 2001) (finding that genuine issues of material fact as to whether the plaintiff was pulled out of her home and thrown to the ground, or whether she was outside of her home and pushed a police officer, precluded entry of judgment in officer's favor on false arrest claim).

### 3. Sloan Is Entitled to Qualified Immunity

Based on the deposition transcripts submitted with Barnhardt's opposition to defendants' summary judgment motion, the facts and circumstances known to Sloan at the time of the February 13, 2004 incident were sufficient to warrant a reasonable officer's belief that Barnhardt had committed the drug offense with which he was charged. Qualified immunity therefore protects Sloan from suit.

Sloan was aware that Barnhardt and his brother allegedly were involved in drug activity, and that a prior attempt to serve Barnhardt with a subpoena ended when Barnhardt fled.

Barnhardt had given two false names before producing proper identification and verifying his identity. Although Sloan did not himself observe Barnhardt toss an object, he reasonably believed that Ramadhan had observed activity worthy of further investigation. Sloan had long experience with drug offenses, and in his experience, Barnhardt's failure to follow instructions to keep his hands on the fender of the SUV "put[] the alert level up a little bit." Sloan Dep. at 29:21-30:1. Only upon Ramadhan's verbal signal did Sloan act to place Barnhardt under arrest.

A police officer may rely on a fellow officer's assessment of circumstances sufficient to warrant a suspect's arrest. *See, e.g., United States v. Hensley*, 469 U.S. 221, 232 (1985) (upholding a police officer's reliance on a flyer or bulletin issued by another police department); *Daniels v. United States*, 393 F.2d 359, 361 (D.C. Cir. 1968) ("There is no requirement that the arresting officer have sufficient firsthand knowledge to constitute probable cause. It is enough that the police officer initiating the chain of communication either had firsthand knowledge or received his information from some person – normally the putative victim or an eye witness – who it seems reasonable to believe is telling the truth."); *Brandon v. City of New York*, No. 07-8789, 2010 WL 1375207, at *7 (S.D.N.Y. Mar. 30, 2010) (concluding that police officers who relied on a fellow officer's signal to arrest the plaintiff were entitled to qualified immunity). Sloan arrested Barnhardt on Ramadhan's signal, and he was not obligated to make an independent determination of probable cause, as long as it was objectively reasonable for him to rely on Ramadhan's decision to arrest under the circumstances. *See Barham v. Salazar*, 566 F.3d 844, 850 (D.C. Cir. 2009) (Henderson, J., concurring) (commenting that a Park Police officer's reliance on an MPD officer's determination that probable cause existed to arrest protestors for failing to obey a police order "must be objectively reasonable for him to be clothed with

qualified immunity"). Here, Sloan reasonably could believe that there was a valid basis to arrest Barnhardt without a warrant based on Ramadhan's investigation of suspicious activity and his subsequent signal to make the arrest.

Sloan did not testify at the preliminary hearing, and neither his actions nor testimony influenced Magistrate Judge Facciola's probable cause determination. Barnhardt does not accuse Sloan of planting evidence, and therefore does not question Sloan's veracity in the same way he challenges Ramadhan's observations and recollection. Moreover, Sloan's recollection of the events is not inconsistent with Barnhardt's version with respect to the alleged tossing of the bag: Barnhardt denies ownership or knowledge of the bag, and Sloan did not see the bag in Barnhardt's hands.

It is true that Barnhardt contends that Sloan and Ramadhan forced his hand into the bag, and that although Sloan and Ramadhan acknowledge that there was a struggle, neither admits that Barnhardt's hands were forced into the bag. "At the summary judgment stage, facts must be viewed in the light most favorable to the nonmoving party only if there is a genuine dispute as to those facts," and where "the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial." *Scott v. Harris*, 550 U.S. 372, 380 (2007) (citations and internal quotation marks omitted). Here, the parties' differing descriptions of the struggle have no bearing on the probable cause question "[s]ince the existence of probable cause turns on the information known to the [officers] at the moment of arrest." *Bonds v. Fizer*, No. 09-2726, 2010 WL 2070241, at *7 (N.D. Ill. May 20, 2010). The struggle occurred *after* Ramadhan signaled Sloan to arrest Barnhardt, and arguments "based on post-arrest developments [are] unpersuasive." *Id*. If the officers forced Barnhardt's hands into the bag, this

action might explain Barnhardt's fingerprint on the scale. But Barnhardt was not arrested based on that fingerprint or anything else relating to a possible struggle with the bag. The decision to arrest, and the probable cause determination, necessarily occurred before any fingerprints had been taken. Crime scene investigators did not even arrive on the scene until after Barnhardt had been transported elsewhere.

Under the circumstances presented in this case, it cannot be said that Sloan violated Barnhardt's Fourth Amendment rights. Sloan acted reasonably in reliance on Ramadhan's signal to arrest. Hence, his conduct is protected by qualified immunity.

### D. Liability of the District of Columbia (Count 4)

Barnhardt also brings a "policy or practice" claim against the District of Columbia under 42 U.S.C. § 1983. He alleges that:

> Acting under color of law, and pursuant to official policy and custom, . . . the District of Columbia knowingly[] or negligently failed to instruct, supervise, control and discipline [Ramadhan and Sloan] in the performance of their duties. This lack of oversight led to the environment in which [Ramadhan and Sloan] were permitted to conspire to falsely arrest [Barnhardt] for their personal motives.

Am. Compl. ¶ 34. The District responds that Barnhardt has failed to demonstrate an unconstitutional policy or practice, and hence all claims against it must be dismissed.

"The failure to train or supervise a city employee can amount to an unconstitutional policy when it can be said that the failure amounts to deliberate indifference towards the constitutional rights of persons with whom the officials come in contact." *Reed v. Dist. of Columbia*, 474 F. Supp. 2d 163, 170 (D.D.C. 2007) (citing *City of Canton v. Harris*, 489 U.S. 378, 388-89 (1989)). The municipality itself must cause the alleged constitutional violation. *Harris*, 489 U.S. at 385 (citing *Monell v. Dep't of Soc. Serv. of the City of New York*, 436 U.S.

-34-

658, 694 (1978) (emphasis in original)). In other words, there must be an affirmative link between the municipal policy or practice and the alleged constitutional violation. *Oklahoma City v. Tuttle*, 471 U.S. 808, 817 (1985). "*Respondeat superior* or vicarious liability will not attach under § 1983," *Harris*, 489 U.S. at 385 (citing *Monell*, 436 U.S. at 694-95), and, therefore, the District cannot be held liable solely on account of the actions of its employees, *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1348 (2009).[8]

A municipality may set a policy in various ways. It may fail "to respond to a need (for example, training of employees) in such a manner as to show 'deliberate indifference' to the risk that not addressing the need will result in constitutional violations." *Baker v. Dist. of Columbia*, 325 F.3d 1302, 1306 (D.C. Cir. 2003) (citations omitted); *see also Daskalea v. Dist. of Columbia*, 227 F.3d 433, 441 (D.C. Cir. 2000); *Muhammad v. Dist. of Columbia*, 584 F. Supp. 2d 134, 138 (D.D.C. 2008). "Deliberate indifference is determined by analyzing whether the municipality knew or should have known of the risk of constitutional violations." *Baker*, 326 F.3d at 1307 (citation omitted). The frequency or consistency of constitutional violations may create a custom marking the need for further training options. *See Atchinson v. Dist. of Columbia*, 73 F.3d 418, 421 (D.C. Cir. 1996); *Warren v. Dist. of Columbia*, 353 F.3d 36, 39 (D.C. Cir. 2004). Where proper training and supervision is absent, that may demonstrate deliberate indifference sufficient to support a claim of a constitutional violation. *Muhammad*, 584 F. Supp. 2d at 138-39; *Thomas v. Dist. of Columbia*, 887 F. Supp. 1, 4 (D.D.C. 1995).

Count 4 of the Amended Complaint does not identify a particular unconstitutional policy

---

[8]    The District of Columbia is "a body corporate for municipal purposes," D.C. Code § 1-102, and is considered a "person" for purposes of § 1983, *see, e.g., Brown v. Dist. of Columbia*, 514 F. 3d 1279, 1283 (D.C. Cir. 2008).

or practice of the District, and Barnhardt does not otherwise describe the District's alleged failure to instruct, supervise or control Sloan and Ramadhan in the performance of their duties. *See* Am. Compl. ¶¶ 33-34. Barnhardt's assertion of the District's constitutional violation is something of a moving target, moreover. What began as an allegation of a lax atmosphere within which Ramadhan and Sloan could conspire to violate Barnhardt's constitutional rights has shifted to an assertion that "the process in which the evidence was gathered after the initial illegal search violat[ed] clearly established law." Pl.'s Opp'n at 5. In support of this assertion, Barnhardt appears to rely on Judge Friedman's favorable ruling on the motion to suppress as evidence both that the search violated his Fourth Amendment rights and that the District failed to supervise and discipline the officers. *See id.* at 5. But that is not enough, as otherwise any alleged Fourth Amendment violation by an officer would also suffice to assert a custom or policy establishing municipal liability. Plainly that is not the law.

Barnhardt also relies on deposition testimony regarding Ramadhan's call to his wife, rather than to a dispatcher, to obtain crime scene search assistance. Barnhardt considers this a "startling admission[]," *id.*, as well as a clear violation of MPD policy. *See id.*, Ex. E (Expert Report of Myron K. Smith) ¶ 1.a. But that, too, is insufficient. "As a general matter, a breach of departmental policy does not by itself constitute a constitutional violation." *Bowen v. County of Westchester*, No. 07-CV-6277, 2010 WL 1529397, at *10 (S.D.N.Y. Mar. 31, 2010) (citing *Virginia v. Moore*, 553 U.S. 164, 172-73 (2008)). Barnhardt was arrested immediately after Ramadhan allegedly found the drugs. Only after Barnhardt had been subdued, handcuffed, and taken away did the officers call for crime scene search officers. Hence, even if Ramadhan violated MPD policy by calling Tina Ramadhan instead of requesting assistance through a

-36-

dispatcher, these events occurred long after Barnhardt's arrest. This alleged deviation from MPD policy, then, could not have contributed to his arrest, as there is no link between this asserted policy and the alleged constitutional violation. *See Johnson v. Williams*, 584 F. Supp. 2d 97, 107 (D.D.C. 2008) (dismissing claims regarding police training and supervision because the plaintiff failed to "identify a causal connection between a deficiency in the District's police training or supervision and his injury"). Indeed, Barnhardt offers no basis to attribute *any* claimed injury to the use of Tina Ramadhan rather than a dispatched crime scene officer.

Moreover, Barnhardt establishes at most that one sergeant and one detective have violated an MPD General Order with respect to summoning a crime scene search officer. But isolated incidents do not rise to the level of a widespread custom or practice. Nothing in the record suggests that the call to Tina Ramadhan resulted from a policy attributable to the District of Columbia. *See Tuttle*, 471 U.S. at 823-34 ("Proof of a single incident of unconstitutional activity is not sufficient to impose liability under *Monell*, unless proof of the incident includes proof that it was caused by an existing, unconstitutional municipal policy, which policy can be attributed to a municipal policymaker."). Indeed, even if Sloan and Ramadhan violated MPD policy by calling Tina Ramadhan, Barnhardt does not rebut defendants' argument that neither officer is authorized to make policy on the District of Columbia's behalf. *See Pembaur v. City of Cincinnati*, 475 U.S. 469, 483 (1986) (plurality opinion) ("We hold that municipal liability under § 1983 attaches where – and only where – a deliberate choice to follow a course of action is made from among various alternatives by the official or officials responsible for establishing final policy with respect to the subject matter in question.") (citation omitted). And it is not enough that Barnhardt alleges that the District of Columbia failed to adequately train Sloan and

Ramadhan. As the Supreme Court has explained, "only where the failure to train amounts to deliberate indifference to the rights of persons with whom the police come into contact" is there liability under § 1983. *Harris*, 489 U.S. at 388; *see also Stewart v. Moll*, No. 07-1085, 2010 WL 1947634, at *8-9 (E.D. Pa. May 11, 2010) (finding insufficient support in the record for plaintiff's contention that the city "created an organizational atmosphere that condoned unconstitutional, reckless and dangerous behavior by individual officers" resulting in the use of excessive force); *Pace v. Town of Southampton*, 678 F. Supp. 2d 79, 88 (E.D.N.Y. 2010) (finding that plaintiff's unsupported assertion of municipal defendants' "fail[ure] to train officers in psychological awareness skills in order to prevent and avoid [the] false arrest of innocent persons" alone does not create a triable issue of fact) (citation and internal quotation marks omitted); *Robinson v. Dist. of Columbia*, 403 F. Supp. 2d 39, 54 (D.D.C. 2005) (concluding that the plaintiff failed to establish a § 1983 claim against the District for failure to train, supervise, or discipline an MPD officer); *Fernandors v. Dist. of Columbia*, 382 F. Supp. 2d 63, 75-78 (D.D.C. 2005) (discussing lack of evidence of widespread unconstitutional strip searches to establish municipal liability under a failure to train or supervise theory). Again, there is no basis on the record here to attribute deliberate indifference to the District with respect to training or any other policy or practice.

For all these reasons, Barnhardt's municipal liability claim under § 1983 fails and summary judgment will be granted for the District of Columbia.

### E. Strip Search (Count 5)

According to Barnhardt, Sloan and Ramadhan "caused [him] to be subjected to a strip search of his body, under circumstances where there was no cause to believe that weap[o]ns or

contraband had been concealed in, or on, his body." Am. Compl. ¶ 37. There allegedly were two strip searches, the first "a partial . . . search outside his home at the time of his arrest[,]" and a second "more thorough search at Narcotics Headquarters[] downtown." *Id.* Barnhardt testified that his pants fell down after Sloan removed his belt prior to transport, but neither officer agrees that a strip search occurred. Barnhardt supplies no specifics regarding the second alleged search. Sloan and Ramadhan deny that any strip search occurred.

None of the parties explain what a strip search entails. However, MPD General Order GO-PCA-502.01, *Transportation of Prisoners* (January 12, 2001) ("General Order 502.01"), defines a strip search as "having a prisoner remove or arrange his/her clothing to allow a visual inspection of the genitals, buttocks, anus, breasts and undergarments." *Id.* at 2; *see Safford Unified Sch. Dist. No. 1 v. Redding*, 129 S.Ct. 2633, 2641 (2009) (finding that the term "strip search is a fair way to speak of" a search that involved the suspect "pulling her underwear away from her body . . . to . . . expose[] her breasts and pelvic area to some degree" to the school officials conducting the search); *United States v. Scott*, 987 A.2d 1180, 1197 (D.C. 2010) (stating that a strip search "may include a visual body cavity inspection (but not a physical intrusion) if particularized reasonable suspicion exists to justify that step").

Aside from Barnhardt's bald assertions, there is nothing in the record consistent with a strip search as the term is defined in General Order 502.01 or case law. And Barnhardt's description of events is at best conclusory; indeed, he only claims that on the first occasion his pants slipped down when his belt was removed, a far cry from the removal of clothing to permit a visual inspection, and he provides no facts at all with respect to the second occasion. He points to no evidence in the record to show that any genuine issue of material fact exists as to whether a

strip search actually occurred on either occasion. The Court therefore will grant summary judgment for defendants on Count 5 of the amended complaint. *See Brandon*, 2010 WL 1375207, at *5 (dismissing plaintiff's conclusory allegation that he was subjected to an illegal and improper strip search because the claim was not supported by any of the factual allegations in the complaint).

### F. Race Discrimination (Count 6)

"All persons within the jurisdiction of the United States shall have the same right in every State and Territory . . . to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens[.]" 42 U.S.C. § 1981(a). "A prima facie case of discrimination requires that the plaintiff suffer an adverse action that gives rise to an inference of discrimination." *Middlebrooks v. Bonner Kierman Trebach & Crociata*, 671 F. Supp. 2d 61, 63 (D.D.C. 2009) (citation omitted).

In Count 6, Barnhardt alleges broadly that Sloan and Ramadhan arrested him because he is African-American. Am. Compl. ¶ 39. Defendants counter that Count 6 should be dismissed due to Barnhardt's failure "to establish that the [d]efendants intended to discriminate against him on the basis of race." Defs.' Mem. at 14. Absent from the record, defendants assert, is "any evidence that the officers were motivated by racial prejudice." *Id.* Defendants need not present evidence in their motion; instead they may point to Barnhardt's failure to produce evidence of racial animus in his opposition. *See Bush*, 595 F.3d at 387.

Barnhardt's opposition merely refers to his own deposition testimony. *See* Pl.'s Opp'n at 3. That Sloan allegedly "called [Barnhardt] a black nigger," Barnhardt Dep. at 82:18, in the circumstances of this case during a struggle to effectuate an arrest, is not a sufficient basis from

which a juror could conclude that the single insult standing alone is evidence of the officer's racial animus as a motivation for Barnhardt's arrest. *See Fletcher v. Dist. of Columbia*, No. 01-0297, 2005 WL 1315213, at *1 (D.D.C. June 2, 2005) (dismissing § 1981 claim based "solely on the fact that during the underlying shooting incident . . . a police officer allegedly used the term "nigger" or "nigga"). If a single alleged racial slur by a police officer during the course of an arrest or other contact with a citizen were sufficient to state a § 1981 claim, the federal courts would be clogged with such claims. There is simply no evidence to support Barnhardt's assertion that the officers intentionally targeted him for arrest because of his race.

### III. CONCLUSION

Collateral estoppel does not bar relitigation of the issue of probable cause in this § 1983 action based on an alleged absence of probable cause for an arrest. Sloan is entitled to qualified immunity, however, and summary judgment will be entered in his favor. But because genuine issues of material fact are in dispute with respect to Barnhardt's arrest, Ramadhan may not be entitled to qualified immunity. Absent a showing that a policy or practice of the District of Columbia caused a violation of Barnhardt's constitutional rights, the District of Columbia cannot be held liable under § 1983, and Count 4 therefore fails. And absent either factual allegations or evidence in the record that a strip search occurred, Count 5 also cannot survive. Finally, Barnhardt has failed to state a claim for race discrimination under § 1981, and therefore Count 6 fails as well. For all these reasons, defendants' motion for summary judgment will be granted in part and denied in part.

A separate Order accompanies this Memorandum Opinion.


_____/s/_____
JOHN D. BATES
United States District Judge

DATE: July 16, 2010